## Underhill Coal Mining Co. v. Irvin

*A. J. Straub*, for plaintiff.

*Robert F. Pontzer* and *Pentz & Silverblatt*, for defendant.

HIPPLE, P. J., June 6, 1947.—This is an action in assumpsit in which plaintiff seeks to recover from defendant the loss of profits from the sale of coal by reason of the alleged failure and refusal of defendant to haul and deliver coal for plaintiff after March 7, 1944, under a written agreement dated April 15, 1943. The case was heard by the court sitting without a jury under the Act of April 22, 1874, P. L. 109, 12 PS §688, and from the pleadings, evidence and admissions of counsel at the time of the hearing the court makes the following

### Findings of fact

1. Plaintiff, Underhill Coal Mining Company, is a corporation of the Commonwealth of Pennsylvania with its principal office in St. Marys Borough, Elk County, Pa., and prior to and since April 15, 1943, has been engaged in the business of mining and selling coal from mines situated in the Village of Tyler, Huston Township, Clearfield County, Pa.

2. Defendant, Willard R. Irvin, is an individual residing in the Village of Penfield, Huston Township, Clearfield County, Pa.

3. Prior to and since April 15, 1943, A. J. Palumbo has been president of Underhill Coal Mining Company, plaintiff.

4. Prior to April 15, 1943, defendant had been employed as a truck driver by plaintiff, operating a truck owned by plaintiff and transporting coal from the mine of plaintiff at Tyler to St. Marys, Roulette and Bradford, Pa.

5. For some time prior to April 15, 1943, A. J. Palumbo, president of plaintiff company, and defendant had conversations and negotiations with reference to the purchase by defendant of a new White 10-ton truck. An application for the purchase of this truck was filed with the Office of Defense Transportation in January 1943, but both A. J. Palumbo and defend-

ant were advised that before a permit to purchase the truck would be issued by the Office of Defense Transportation it was necessary for plaintiff and defendant to execute a contract setting forth the terms under which defendant proposed to transport coal for plaintiff.

6. On April 15, 1943, plaintiff and defendant executed a written contract as follows:

"AGREEMENT, Made this 15th day of April, 1943, by and between UNDERHILL COAL MINING COMPANY, a corporation under the Laws of Pennsylvania, with its principal office in the Borough of St. Marys, Elk County, Pennsylvania, hereinafter called "Producer", and WILLARD R. IRVIN, of the Township of Huston, Clearfield County, Pennsylvania, hereinafter called "Trucker".

"NOW, THIS AGREEMENT WITNESSETH, That in and for the consideration of One Dollar in hand paid to Trucker by Producer, the receipt whereof is hereby acknowledged by Trucker, Trucker covenants and agrees with Producer that he will, when and as he receives delivery of one White WA22, 21000 pound truck, contract to haul coal from Producer to the consumers or purchasers thereof from Producer and will use said truck six days each week for the duration of the present war, except such days as said truck may be compelled to undergo repairs.

"Trucker will deliver said coal to the customers as designated by Producer, and it is agreed that Producer will pay Trucker for the hauling of said coal a sum equal to railroad freight rates, where such rates prevail from nearest raiload shipping point to Producer's mine to point of delivery, and will pay Trucker on the 10th of each month for all coal hauled during the preceding month.

"Trucker covenants and agrees that in the event he refuses to haul said coal for any reason, except

damage or loss of said truck, that he will indemnify Producer for any loss or damage sustained by Producer by reason of such failure to haul.

"The Trucker covenants that in the event he is personally unable to operate said truck, to employ other truck drivers to keep said truck at work.

"IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their hands and seals the day and year first above written.

UNDERHILL COAL MINING COMPANY
By (Signed)  A. J. Palumbo,
President.
(Signed)  Willard R. Irvin        (SEAL)

"Witness:
"(Signed)  J. J. Pentz
"(Signed)  J. J. Pentz."

7. By the terms of this contract plaintiff was designated as "Producer" and defendant as "Trucker". Thereunder defendant as "Trucker" agreed, upon delivery of one White WA22, 21,000 pound truck, to haul coal from "Producer to the consumers or purchasers thereof from Producer and will use said truck six days each week for the duration of the present War, except such days as said truck may be compelled to undergo repairs", with the provision that if defendant "Trucker" refused to haul coal for any reason "except damage or loss of said truck", he would "indemnify Producer for any loss or damage sustained by Producer by reason of such failure to haul".

8. When this contract was executed on April 15, 1943, defendant had made no application to the Public Utility Commission of the Commonwealth of Pennsylvania for a license to operate the truck in question as a contract carrier, and he did not on April 15, 1943, nor any time thereafter have a license to operate as a contract carrier.

9. After the contract of April 15, 1943, was executed, it, or a copy thereof, was forwarded to the Office of Defense Transportation at Washington, D. C., whereupon a permit was issued for the purchase of the truck in question. The purchase price of the truck and its equipment was financed and paid for partly by plaintiff in the nature of a loan to defendant, and by defendant. Defendant repaid plaintiff for the moneys advanced by it for the purchase of the truck.

10. Defendant commenced to haul coal for plaintiff with the truck in question in May 1943, and continued to haul coal under the terms of the contract until March 7, 1944.

11. During the month of August 1943 defendant was stopped upon the highway while operating his truck by a representative of the Public Utility Commission, and was advised that it would be necessary for him to have a license in order to operate as a contract carrier. Each of his drivers was stopped on several occasions, at Kane, at the intersection between Kane and Bradford, and at Fair View.

12. In the fall of 1943 Charles F. Grieco, as investigator for the Public Utility Commission, Bureau of Motor Transportation, interviewed defendant at his home and told defendant he had no right to operate as a contract carrier without a license from the Public Utility Commission. He was advised to file an application with the commission for such license and there were left with him application forms for that purpose. He was also informed that he would be subject to fines for the first and second offenses and that the third offense was a misdemeanor for which the penalty was a fine of not less than $500 or imprisonment for six months.

13. Defendant advised A. J. Palumbo that it was necessary for him to secure a license from the Public

Utility Commission whereupon some time in the fall of 1943 Mr. Palumbo talked to Charles F. Grieco by telephone and was told by Mr. Grieco that defendant, having no license from the commission, had no right to haul coal for hire, and that defendant would be obliged to discontinue hauling for hire, until he received a license from the commission. Mr. Palumbo thereupon inquired whether there was any way by which defendant could continue to haul coal until a license could be issued, and was advised by Mr. Grieco the only way by which defendant could haul legally would be for defendant to buy and sell the coal, but that it must be a bona fide arrangement, and could not be done by any subterfuge.

14. In January 1944 defendant filed an application with the Public Utility Commission for the issuance of a license to him as a contract carrier, to which on or about February 16, 1944, the Pennsylvania Railroad Company filed a protest. The railroad company subsequently submitted a proposed stipulation whereby the company would withdraw its protest, but would limit defendant to the transportation of coal to a distance of not more than 15 miles from the Village of Tyler.

15. The Public Utility Commission will not grant a temporary certificate or license to operate as a contract carrier until an application is filed with the commission, and then only if no protests are filed against the permanent issue thereof.

16. The stipulation proposed by Pennsylvania Railroad Company, would not, if accepted, have permitted defendant to haul coal from the mines of plaintiff at Tyler to St. Marys Borough because the distance was more than 15 miles from point of origin to point of destination of the coal. Defendant would likewise have been prevented from hauling coal from plaintiff's mine

to Bradford, Roulette, or any other point more than 15 miles distant from Tyler.

17. On March 6, 1944, A. J. Palumbo and defendant met at the office of John J. Pentz, Esq., at Clearfield, Pa., where for some time they discussed the situation arising from the protest made by the Pennsylvania Railroad Company against the application of defendant to the Public Utility Commission for a license as a contract carrier. They were advised that it was necessary for defendant to have such license. Mr. Palumbo suggested that defendant purchase coal at plaintiff's mines at Tyler, taking a way-bill for the coal and selling the coal back to plaintiff upon reaching Roulette, but both parties were told that this would not be permissible and that the only possible way would be for defendant to make an actual outright purchase of the coal from plaintiff at plaintiff's mine, without any subterfuge, that such transaction must be bona fide, but that it was doubtful whether such arrangement would stand upon investigation by the Public Utility Commission.

18. As a result of this conference in the office of John J. Pentz, Esq., A. J. Palumbo, acting for plaintiff, stated in effect, that they would end the contract, get it out of the way so that defendant could proceed to purchase his coal. They were informed that if the contract was to be terminated, it should be in writing, whereupon Mr. Palumbo stated to Mr. Pentz that he should go ahead and "write it up".

19. Two letters were then prepared by Mr. Pentz, both on March 6, 1944, one dated February 29, 1944, addressed to Underhill Coal Mining Company, St. Marys, Pa., and signed by defendant, and the other dated March 3, 1944, addressed to defendant at Penfield, Pa., and signed by plaintiff company, by A. J. Palumbo, president. These letters are as follows:

"Penfield, Pa. February 29, 1944.
"Underhill Coal Mining Company
St. Marys, Pennsylvania.
Gentlemen:—

I have been cited by the Pennsylvania Utility Commission as a contract carrier.

The limitation placed on me as such will prohibit me from fulfilling our contract to haul coal made April 15, 1943.

Due to causes beyond my control I will be unable to continue hauling coal under the contract above mentioned.

Yours very truly."

.    .    .    .    .    .    .    .    .

"UNDERHILL COAL MINING COMPANY,
BITUMINOUS COAL.

Mines at        St. Marys, Pennsylvania.  Telephone
TYLER, PA.                                5641

March 3, 1944.

Mr. Willard Irvin,
Penfield, Pennsylvania.
Dear Sir:

This is to acknowledge your letter of February 29.

We are very sorry that you cannot continue to haul coal under our contract.

However we will sell you all the coal you desire at the O. P. A. prices f. o. b. our mine at Tyler, you to hold us clear of any liability from the time your truck leaves our tipple. All coal sales will be paid on the first of each month and not to go longer than the first day of each month for coal purchased the preceding month.

Your very truly
Underhill Coal Mining Co.
By A. J. Palumbo,
President."

20. It was the intention of plaintiff and defendant, as a result of their conference on March 6, 1944, to cancel and rescind the contract made between the parties dated April 15, 1943, and to substitute therefor the offer by plaintiff to sell to defendant all the coal desired at the O. P. A. prices, f. o. b. plaintiff's mine at Tyler, defendant to hold plaintiff clear of any liability from the time his truck left the tipple at plaintiff's mine, and that defendant should pay on the first day of each month for the coal purchased during the preceding month.

21. The contract of plaintiff for the sale and delivery of coal to Gray Chemical Company at Roulette was made with a brokerage house doing business as Coal Hill Mining Company at Du Bois, Pa., and not with the chemical company itself. Gray Chemical Company received some but not all of its coal from Underhill Coal Mining Company. On or about March 15, 1944, Gray Chemical Company canceled its contract with Coal Hill Mining Company whereupon deliveries of coal from plaintiff company to Gray Chemical Company ceased.

22. The plant superintendent of Gray Chemical Company discussed with defendant about the time its contract with Coal Hill Mining Company was canceled as to whether defendant would be able to get coal for delivery to the chemical company, and after the cancellation of the chemical company's contract defendant commenced to haul coal to the chemical company at Roulette.

### Discussion

The two legal questions involved in this matter are:

I. Did the parties by their conduct prior to and on March 6, 1944, and by the exchange of the two letters, Exhibits 4 and 5, cancel or rescind the contract of April 15, 1943; and

II. Was the contract of April 15, 1943, illegal at the time of its inception because defendant did not have a license from the Public Utility Commission to operate as a contract carrier on that date, or at any time thereafter?

It is evident from a preponderance of the evidence, that when the parties met on March 6, 1944, at Clearfield for the purpose of discussing the situation that had arisen because defendant was operating as a contract carrier illegally and was liable to be prosecuted, the result was a meeting of the minds of defendant and the president of plaintiff company to the effect that the contract of April 15, 1943, would be canceled. Considered in connection with the discussion as to the possibility of defendant purchasing coal from plaintiff at plaintiff's mine and selling the coal to other companies, no other construction can be placed upon the two letters passing between the parties. The letter dated February 29, 1944, from defendant to plaintiff clearly states that the limitations placed upon him by law as a contract carrier would prohibit him from fulfilling the contract of April 15, 1943, and therefore "due to causes beyond my control I will be unable to continue to haul coal under the contract above mentioned". This was followed by the letter of March 3, 1944, addressed to defendant by plaintiff company in which plaintiff states "we are very sorry that you cannot continue to haul coal under our contract". Plaintiff then offered to sell coal to defendant at certain prices at plaintiff's mine at Tyler with certain stipulations and provisions as to when payment therefor should be made.

While no explanation is given why these two letters were dated February 29 and March 3, 1944, yet the evidence is undisputed that they were prepared on March 6, 1944, were signed on that date and the original of each letter was delivered to the addressee. It is true that on March 7, 1944, the day after the ex-

change of the letters referred to, defendant did haul some coal for plaintiff, yet both parties knew that in so doing defendant was acting illegally. In our opinion, this does not affect the intention of the parties to cancel and rescind the contract, which was done on March 6, 1944, by the exchange of the two letters.

Plaintiff contends that the two letters do not constitute a termination of the contract because there was only a refusal on the part of defendant to continue operations under the contract followed by a counter proposition from plaintiff which was not accepted by defendant and that the letter of February 29, 1944, was merely notice by defendant of an intended breach of the contract.

However, the letter of March 3, 1944, specifically states "We are very sorry that you cannot continue to haul coal under our contract". This is an acknowledgment by plaintiff that the contract could no longer be performed by defendant, not because defendant was unwilling, but because he was prevented by law from performing and therefore the contract would be no longer in force. There was a distinct meeting of the minds of the parties, and the sole discussion in the office of Mr. Pentz was regarding what arrangement could be made for defendant to purchase coal and deliver it as his own property. The president of plaintiff company was apparently willing to make the way bills out in the name of defendant but wanted to have them resold or transferred to plaintiff when defendant reached his destination. Such arrangement would have been a mere subterfuge and the parties were rightly advised by Mr. Pentz in that respect.

Plaintiff cites Zuck & Henry v. McClure & Co., 98 Pa. 541, in support of the principle that mere notice of an intended breach of contract is not of itself a breach of the contract but may only become so if accepted and acted upon by the other party. In that case,

however, the chief question was whether defendant was entitled to set off against plaintiff's claim, damages for a breach of a contract between the parties, the breach not being complete at the time the suit was instituted. The action was commenced to recover the purchase price of coke delivered by plaintiffs to defendants during the month of October and defendants set up as a defense the breach of a contract made on November 11,.1879, for future deliveries of coke. Later in the same month plaintiffs notified defendants they would not deliver the coke whereupon, on December 4th, four days after the delivery was to have commenced, defendants not only did not accept the notice of the intended breach of the contract by plaintiffs but insisted upon compliance. The contract of November 11, 1879, was therefore kept alive as to both parties, but since there was no breach of the contract of November 11th, when the action was instituted on November 29th, defendants were not entitled to a set-off notwithstanding that when the cause was tried the breach was complete.

If the letter of February 29, 1944, from defendant to plaintiff is held to be a notice of an intended breach of the contract of April 15, 1943, the intended breach was accepted and acted upon by plaintiff. The expression by plaintiff in the letter of March 3, 1944, that plaintiff was very sorry that defendant could not continue to haul coal under the contract was an acceptance and acknowledgment by plaintiff of such intended breach by defendant and was in effect a rescission and cancellation of the contract. Thereafter, the contract was not kept alive or in force nor was it the intention of the parties that the contract should be in force after March 6, 1944. In this respect the situation is different from that in the Zuck case as well as in the cases of Clavan v. Herman et al., 285 Pa. 120, McCormick et al. v. Fidelity & Casualty Co., 307 Pa. 434, and Shamlian et al. v. Waxman, 80 Pa. Superior Ct. 73.

The legislature, by the Public Utility Law of May 28, 1937, P. L. 1053, art. XIII, sec. 801, 66 PS §1301, specifically declared that it was a matter of public policy to regulate the service of common carriers by motor vehicle and stated as a fact, after due investigation and deliberation, that the service of contract carriers by motor vehicle and other service by motor vehicles were so closely interwoven and interdependent and so directly affected each other, that it was necessary to regulate the service of contract carriers by motor vehicles. Section 804, as amended by the Act of July 3, 1941, P. L. 267, specifically provides that "No person or corporation shall render service as a contract carrier by motor vehicle unless there is in force with respect to such carrier a permit issued by the commission, authorizing such person or corporation to engage in such business."

The operation of a motor vehicle by one as a contract carrier without securing a permit subjects such person to arrest and to the imposition of a minimum fine of not less than $25 for the first or second offense, and for any subsequent offense the Act of May 28, 1937, P. L. 1053, as amended, by the Act of July 3, 1941, P. L. 267, 66 PS §1501, the person so violating the act is guilty of a misdemeanor, and upon conviction is liable to a minimum fine of $100, or imprisonment not exceeding six months, or both.

When the contract of April 15, 1943, was executed by plaintiff and defendant, both were presumed by law to know that it was an illegal contract and could only have been made valid by the securing of a permit from the Public Utility Commission authorizing defendant to operate as a contract carrier. Notwithstanding, plaintiff and defendant continued to operate under the contract until defendant was warned to discontinue operation.

This was a contract founded upon a transaction in violation of a public policy declared by the legislature.

No court will lend its aid to the enforcement of such contract. It is clear from the preponderance of the testimony that plaintiff recognized the illegality of the contract and that this was one of the controlling factors which led to its cancellation, and to the attempt to make some other arrangement in lieu of operation under the contract itself.

Plaintiff and defendant are not the only parties concerned. The legislature has specifically declared the public policy of the Commonwealth with relation to the operation of contract carriers by motor vehicle and that it is in the public interest to regulate such service. Therefore, as stated by the Supreme Court in Swing, etc., v. Munson, 191 Pa. 582, 588:

". . . in enforcing the policy in the interests of the whole public, the law takes but little note of the conduct of the immediate parties to the contract; the rule is, that courts, having in view public interests, will not lend their aid to the enforcement of an unlawful contract."

To the same effect is F. F. Bollinger Co. v. Widmann Brewing Corp., 339 Pa. 289, in which recovery was denied for compensation for architectural and engineering services rendered by plaintiff in violation of the Act of July 12, 1919, P. L. 933, regulating the practice of architecture, and also the Act of May 6, 1927, P. L. 828, regulating the practice of engineering. Plaintiff admitted that it had failed to comply with the regulations of these statutes but insisted that there was no express prohibition contained therein against the enforcement of contracts made in violation of their provisions, or in other words, there was nothing in the acts which forbade recovery for services rendered by plaintiff. The Supreme Court, in reversing, laid down the principle that:

". . . it is well settled that the courts will not lend their aid to the enforcement of unlawful contracts

which are founded upon transactions *in violation of a public policy declared by the legislature*. We have followed this principle and denied recovery for services where there has been a failure to comply with statutory requirements for licensing and registration. In many such cases there was no express provision in the statutes denying recovery upon the contract." (Italics supplied.)

Citing Reilly v. Prudential Ins. Co., 264 Pa. 61, and Golder v. Rabinowitz, 125 Pa. Superior Ct. 573, from which the Supreme Court quoted the following citation: "The plaintiff cannot recover for a service *which he was prohibited by the statute from performing.*" (Italics supplied.) See also Johnson v. Hulings, 103 Pa. 498, Verona v. Schenley Farms Co., 312 Pa. 57, and also Luce v. Cook, 227 Pa. 224, in which the Supreme Court said:

"This rule rests upon the theory that since *the law prohibits under a penalty* the doing of business by unlicensed brokers, contracts providing for the payment of commissions to such persons are opposed to good morals and public policy and cannot be enforced." (Italics supplied.)

The Supreme Court further observed that there was no force to the contention that penalties imposed by statutes were intended to be the sole punishment for infractions thereof, because "if the courts were to enforce such unlawful contracts the relatively small fines to which violators of the law are made subject would be insufficient to discourage repeated violation".

The court distinguished between the decisions under the Fictitious Names Act because that particular statute was limited to the protection of *individuals* from fraud. In the Public Utility Law the interest of the public at large is involved as is specifically stated in the declaration of policy in the Act of May 28, 1937, P. L. 1053.

In Monaca Borough v. Monaca Street Railway Co., 247 Pa. 242, 247, it was also held that "The law never exacts performance of a contract where performance would involve violation of law".

What is the situation here? Both parties knew the contract was incapable of performance unless a permit was obtained from the Public Utility Commission by defendant, and the operation by defendant as a contract carrier from the inception of the contract until its cancellation on March 4, 1944, was in plain violation of the Public Utility Law, which both parties knew, or were presumed to have known. The contract was therefore illegal in its inception and no recovery can be had thereon. Defendant in fact was not legally competent to enter into this contract because he had not complied with the statute.

However, plaintiff contends that defendant was bound to perform the contract in such manner that it would be lawfully executed and that it was the legal duty of defendant to obtain a permit in order that he could lawfully operate as a contract carrier. With this position we cannot agree, and the cases cited by plaintiff do not sustain this contention insofar as they might apply to the facts of this case. This argument appears to be based upon the proposition that the contract in itself was valid and binding, that there is nothing in the Public Utility Law which implies that such a contract is illegal or void, and that the proper and legal execution of the contract was contemplated by the parties. On the contrary the contract was neither valid or binding. It was in direct conflict with the provisions of the Public Utility Law which specifically provides that it is in the public policy to regulate contract carriers by motor vehicle and makes it a penal offense for one to operate as a contract carrier without obtaining a permit. Plaintiff was presumed to know that defendant would not be able to comply with

the contract unless a permit was obtained, and when it became impossible for defendant to obtain such permit, after both he and plaintiff were warned by a representative of the Public Utility Commission an effort was made by plaintiff to bill the coal from its mine to defendant in such manner as to amount to a mere subterfuge. This would have been nothing more or less than a fraud upon the commission.

The court therefore makes the following

### Conclusions of law

1. The contract executed on April 15, 1943, between plaintiff and defendant was canceled and rescinded by the parties on March 6, 1944, and thereafter was no longer in effect.

2. Because the contract was canceled, defendant was under no obligation to haul coal for plaintiff under the terms of the contract after March 6, 1944.

3. The contract of April 15, 1943, at the time of its execution was founded upon a transaction in violation of the Public Utility Law of May 28, 1937, P. L. 1053, and its amendment. It was in violation of the public policy declared by the legislature in the Public Utility Code, and therefore, being an unlawful contract, it cannot and will not be enforced.

4. Plaintiff is not entitled to recover under the contract and therefore judgment should be entered in favor of defendant.

Therefore, the following order is entered:

### Order

And now, June 6, 1947, the Prothonotary of Elk County is hereby directed to file and enter of record this opinion and order, to give notice thereof forthwith to the parties, or their attorneys of record, and if no exceptions are filed within 30 days after service of such notice the prothonotary is hereby directed to enter judgment in the above case in favor of defendant.